IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) 2:18-cr-188-2 |
| | ) 2:20-cr-73-1 |
| MARCIA RAMSIER ARTHURS, | ) |
| | ) |
| Defendant. | ) |

## **OPINION**

**Mark R. Hornak, Chief United States District Judge**

Before the Court is Defendant Marcia Ramsier Arthurs' Motion for Compassionate Release ("Motion"). Ms. Arthurs is currently serving a sixty-three (63) month sentence for conspiracy to distribute fentanyl, methadone, and oxycodone, to commit health care fraud and to launder money in violation of 21 U.SC. § 846, 18 U.S.C. §§ 1349, 1956(h), respectively, as well as theft of public money, property or records in violation of 18 U.S.C. § 641. (ECF No. 199.) Her in-custody sentence is to be followed by three (3) years of supervised release. (*Id.*)

When Ms. Arthurs filed her present Motion, she was housed at FCI Dublin. However, Ms. Arthurs is currently serving her sentence at FCI Phoenix Satellite Camp. Ms. Arthurs filed the Motion stating that her serious medical conditions in light of the COVID-19 pandemic authorize a reduction in her sentence. She also argues that upon consideration of the § 3553(a) factors, release is warranted.

Based on the current record, the Court concludes that Ms. Arthurs' Motion is properly before it and that her medical condition does present an extraordinary and compelling basis for release, although the availability of the COVID-19 vaccine, particularly m-RNA vaccines produced by Pfizer and Moderna, materially mitigates such basis for release. However, the Court

also concludes that the § 3553(a) factors, principally the severity of her offense conduct and the relatively short period of time she has already served in custody, strongly counsel against release at this time. As a result, Defendant's Motion for Compassionate Release is DENIED without prejudice subject to its reassertion should circumstances warrant.

I. **BACKGROUND**

On April 27, 2020, Ms. Arthurs pleaded guilty to one count of conspiracy to distribute fentanyl, methadone, and oxycodone, one count of conspiracy to commit health care fraud, and one count of conspiracy to launder money. (ECF No. 165). Ms. Arthurs also pleaded guilty to one count of theft of public money, property or records. (ECF No. 1, 9 at Dkt. 20-cr-73.)

The Court imposed a sentence of sixty-three (63) months for all charges, to be served concurrently, followed by a term of three (3) years of supervised release. As of the date of this Opinion, Ms. Arthurs has served approximately fifteen (15) months of BOP incarceration, and the BOP lists Ms. Arthurs' release date as May 16, 2025. *See* Bureau of Prisons Inmate Locator, *Federal Bureau of Prisons*, https://www.bop.gov/inmateloc/ (last visited March 7, 2022).

On February 16, 2021, Ms. Arthurs filed her Motion for Compassionate Release, *pro se*, expressing concerns about her underlying health conditions and the potential of contracting a severe case of COVID-19 and asking that the Court release her. (ECF No. 234.) Counsel was appointed and a supplement was filed on September 10, 2021. (ECF No. 251) Ms. Arthurs, through her counsel, filed an administrative request for release with the Warden at FCI Dublin on July 27, 2021, which was denied on July 30, 2021. (ECF Nos. 251, 251-1.) Ms. Arthurs' counseled supplement, supported by her sealed medical records, argues that her medical conditions, specifically her diagnosis of chronic obstructive pulmonary disease ("COPD") put her at a higher

2

risk of contracting a severe case of COVID-19. She further argues that she is unable to get vaccinated because of a prior bad reaction to the swine flu vaccine in the late 1970s, and that she is at an even greater risk of contracting COVID-19, making her medical reasons for release even more extraordinary and compelling. The Government opposed Ms. Arthurs' Motion. (ECF No. 256.)

On February 28, 2022, the Court held oral argument on the Motion. The Motion is now ripe for disposition.

## II.  LEGAL STANDARD

"[A]s a general matter, a court cannot modify a term of imprisonment after it has been imposed without specific authorization." *McMillan v. United States*, 257 F. App'x 477, 479 (3d Cir. 2007); *see also Dillon v. United States*, 560 U.S. 817, 819 (2010). One such specific authorization is the First Step Act's amendment of 18 U.S.C. § 3582. As amended, that provision allows a court to modify a defendant's term of imprisonment if "extraordinary and compelling reasons warrant such a reduction." § 3582(c)(1)(A)(i). In addition, the court must consider: (1) whether the defendant has exhausted the appropriate administrative remedies; (2) the factors set forth in 18 U.S.C. § 3553(a) to the extent that they are applicable; and (3) whether such a reduction is consistent with applicable policy statements issued by the Sentencing Commission. § 3582(c)(1)(A).

## III.  DISCUSSION

### A. Administrative Exhaustion

To consider the merits of Ms. Arthurs' Motion, the Court must first determine whether Ms. Arthurs has complied with § 3582(c)(1)(A)'s exhaustion requirement. Prior to petitioning a court

3

for relief under § 3582(c), a defendant must first file an administrative request for compassionate release with the warden of their facility and then either: (1) fully exhaust the Bureau of Prison's ("BOP") administrative remedies; or (2) wait thirty (30) days from the date their administrative request was filed with the warden. The Third Circuit has confirmed that either of § 3582(c)(1)(A)'s options (acting independently of one another) are sufficient to satisfy the exhaustion requirement. *See United States v. Harris*, 973 F.3d 170, 171 (3d Cir. 2020) (rejecting the argument that a defendant is required to completely exhaust the administrative remedy process if the warden denies a request within thirty (30) days of receiving it, primarily because "the statute states that the defendant may file the motion [before a district court] thirty days after the warden receives his request").

Here, Ms. Arthurs has met the exhaustion requirement. She filed a request for compassionate release on July 27, 2021, and according to her counsel, the Warden denied her request on or about July 30, 2021. (ECF No. 251, 2–3.) The Government also does not contest that the exhaustion requirements have been met. (ECF No. 256.) It concedes that the Motion is ripe because Ms. Arthurs submitted a request for release citing the health conditions raised in her Motion and 30 days have passed from receipt of such a request by the Warden. (*Id.*) The Court is

satisfied that under the 30 day option, Ms. Arthurs has met the administrative exhaustion requirement and will proceed accordingly.[1]

### B. "Extraordinary and Compelling" Reasons

Next, the Court must determine whether Ms. Arthurs' stated conditions in light of the still ongoing COVID-19 pandemic rise to an "extraordinary and compelling" level, such that consideration of release from prison would be permitted by § 3582(c)(1)(A)(i).

Section 3582 does not define the phrase "extraordinary and compelling reasons." Instead, Congress delegated that task to the Sentencing Commission. *See* 28 U.S.C. § 994(t) (stating that the Sentencing Commission "shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."). The Sentencing Commission defined "extraordinary and compelling" as it related to the BOP's discretion under the pre-First Step Act version of § 3582(c)(1)(A)(i) in a policy statement contained in § 1B1.13 of the U.S. Sentencing Guidelines Manual (the "Guidelines"), but the Commission has not updated the policy statement since the First Step Act became law. *See United States v. Rodriguez*, 451 F. Supp. 3d 392, 396 (E.D. Pa. Apr. 1, 2020).

In *United States v. Andrews*, the Third Circuit explained that given the lack of an updated applicable Policy Statement defining "extraordinary and compelling," "the existing policy

---

[1] The Court notes that when Ms. Arthurs filed her Motion, she was housed at FCI Dublin, and she sent her request for compassionate release to the Warden of that facility. (See ECF Nos. 251, 252-1.) However, Ms. Arthurs was subsequently transferred to the FCI Phoenix Satellite Camp, *see* ECF No. 79 at Dkt. 20-cr-73 ("Sealed Affidavit"), and based on the record, the Warden of FCI Phoenix Satellite Camp has not received any request for her compassionate release. However, the Court concludes that Ms. Arthurs has still satisfied the goals of exhaustion since her "transfer in the interim does not change the fact that the BOP had the first crack at resolving the issue." *United States v. Davidson*, 2:16-CR-00139-2, 2020 WL 4877255, at *7 (W.D. Pa. Aug. 20, 2020) (stating that the Defendant who was transferred to another facility after requesting compassionate release had met the exhaustion requirements, particularly because the BOP has the "sole authority and discretion to designate the place of a defendant's confinement.").

statement is not applicable—and not binding—for courts considering prisoner-initiated motions" for compassionate release—adopting the position that all but one other Courts of Appeals to address the issue have taken. 12 F.4th 255, 259 (3d Cir. 2021). However, "although the policy statement is no longer binding, it still sheds light on the meaning of extraordinary and compelling reasons." *Id.* at 260. This is because "Congress legislates against the backdrop of existing law," and thus, by "reenact[ing] the compassionate-release statute without any alterations to the phrase 'extraordinary and compelling reasons,'" Congress likely intended the phrase to retain the meaning that the Sentencing Commission gave it in its pre-First Step Act Policy Statement. *Id.* Thus, in reviewing this Motion, this Court does not use the provisions of U.S.S.G. § 1B1.13 and its Application Notes as "an ultimate binding authority" but uses it as a guide in its analysis.

The Court concludes that Ms. Arthurs' COPD diagnosis, in light of the COVID-19 pandemic, establishes an extraordinary and compelling reason authorizing release. However, the Court also determines that the increased risk of severe illness from COVID-19 because of her diagnosis is materially mitigated by the presence and availability of the Pfizer and Moderna vaccines.

Ms. Arthurs states that she has COPD, which is a severe chronic lung disease. (*See* ECF No. 252.) Ms. Arthurs argues that her condition fits into the U.S.S.G. § 1B1.13 definition of "extraordinary and compelling," which is defined as a defendant suffering from a "serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover," because according to the CDC, persons with chronic lung diseases like COPD are more likely to get more severely sick from COVID-19. (ECF No. 251, at 5).

Further, Ms. Arthurs argues that it is recommended that people who are more likely to get a severe case of COVID-19 take immediate preventive actions like staying inside and avoiding living in close quarters with others, all things that Ms. Arthurs argues are not possible to do in a BOP facility. (*Id.*); *see also, United States v. Stiver*, No. CR 17-64, 2021 WL 1110593, at *1 (W.D. Pa. Mar. 23, 2021) ("[T]he Court agrees, that . . . a condition classified by the CDC as one causing an increased risk of severe illness from the COVID-19 virus, can be considered an 'extraordinary and compelling reason'"). At oral argument, Ms. Arthurs testified that at the FCI Phoenix Satellite Camp social distancing and masks wearing by both other inmates and the staff is not strictly enforced, she is in a dormitory style, open-air sleeping facility without what she considers to be adequate air filtration, and that out of roughly seventy (70) inmates in the unit, it was rumored that roughly half, thirty-five (35) women, had gotten COVID-19. She also testified that the facility was recently on lockdown for roughly two (2) months due to COVID-19 concerns.

Ms. Arthurs also contends that she is unable to get the COVID-19 vaccine because she previously developed Guillain-Barré Syndrome ("GBS") after getting the swine flu vaccine sometime between 1976 to 1977. (ECF No. 79, Dkt. 20-cr-73) ("Sealed Affidavit"). Ms. Arthurs states that she has been "told by doctors to decline further vaccination, including any vaccine for COVID-19" as a result of her GBS diagnosis. (*Id.*) However, during oral argument, Ms. Arthurs testified that since her prior GBS diagnosis she has, more than once, received the seasonal flu vaccine and that she was only told to decline the COVID-19 vaccine.

In its briefing the Government concedes that Ms. Arthurs has established extraordinary and compelling reasons that could justify compassionate release, but only in the context of the current COVID-19 pandemic because COPD is listed as a condition that may cause a higher risk of severe

7

illness from COVID-19. (ECF No. 256.) However, during oral argument, the Government argued that in light of the wide availability of vaccines and absent a showing from Ms. Arthurs through testimonial evidence or medical records that she cannot receive the vaccine or was specifically told by doctors not to take the vaccine for medical reasons, her condition is not extraordinary and compelling. The Government argues that Ms. Arthurs' medical records and her testimony during oral argument which reveal that she has received other vaccines, including the seasonal flu vaccine, demonstrate that her refusal to get the COVID-19 vaccine is not warranted and that this status should be a factor weighing against a finding that extraordinary and compelling reasons for release exist.

The Court agrees with the Government that Ms. Arthurs' refusal to take the COVID-19 vaccine, which would materially mitigate her risk of contracting COVID-19, does make her situation less compelling. *See United States v. Gray*, No. 2:13-CR-11, 2020 WL 5350444, at *5 (W.D. Pa. Sept. 4, 2020) ("The word 'extraordinary' is commonly understood to mean 'going beyond what is usual, regular, or customary,' or 'exceptional to a very marked extent.' Extraordinary, Merriam-Webster Dictionary (2020); *see also* Extraordinary, Black's Law Dictionary (11th ed. 2019) ('Beyond what is usual, customary, regular, or common.'). The word 'compelling' means 'forceful,' 'demanding attention,' or 'convincing.' Compelling, Merriam-Webster Dictionary (2020); *see also* Compelling Need, Black's Law Dictionary (11th ed. 2019) ('A need so great that irreparable harm or injustice would result if it is not met.'). Thus, 'at a minimum, [section] 3582(c)(1)(A)(i) requires a justification for release that is both **unusual** (*i.e.*, unique to the inmate, and beyond the ordinary hardship of prison) and **significant** (*i.e.*, serious enough to make release appropriate).' *Somerville*, 2020 WL 2781585, at *7 (emphasis in original).")

8

During oral argument Ms. Arthurs testified that after she expressed her "serious concerns" about the COVID-19 vaccine because of her previous bad reaction to the swine flu vaccine, Dr. Duncan, a physician at FCI Dublin, told her that she should decline the COVID-19 vaccine "if [she] felt that way." In the Court's view, this statement does not amount to medical advice to not take the COVID-19 vaccine based on the physician's medically supported concerns, but instead is akin to a response by the physician based on his reaction to *Ms. Arthurs'* own assessment of her suitability for the vaccine. Ms. Arthurs offered no other evidence of any medical advice given by any other physician regarding the COVID-19 vaccines or vaccines in general, nor did Ms. Arthurs provide any testimony or evidence that any physician she consulted, or who had considered any medical history or records, physical examination, statistics or medical research confirming a medical basis for her fear of contracting GBS from the COVID-19 vaccines in the context of her specific situation. The Court concludes that the statement of Dr. Duncan as recited by Ms. Arthurs simply is not medical advice based on any consideration of her specific history in that it was not a medical assessment that she was medically disqualified from being vaccinated, or that such was not a medically sound course of action. It was instead, at best, an affirmation by a physician that Mr. Arthurs should proceed as she described "if she felt that way".

Notably, according to the CDC, "Guillain-Barré Syndrome (GBS) in people who have received the J&J/Janssen COVID-19 vaccine is rare . . . [and] **[a]nalysis found no increased risk of GBS after Pfizer-BioNTech or Moderna (mRNA COVID-19 vaccines).**" *See* Center for Disease Control and Prevention, *Selected Adverse Events Reported after COVID-19 Vaccination* https://www.cdc.gov/coronavirus/2019-ncov/vaccines/safety/adverse-events.html (emphasis added). Similarly, with respect to the seasonal flu vaccine, the CDC has found that while "there is

9

an increased risk of GBS following flu vaccination[,] it is small . . . ." *See* Center for Disease Control and Prevention, *Guillain-Barré syndrome and Flu Vaccine* https://www.cdc.gov/flu/prevent/guillainbarre.htm (stating further that the "background rate for GBS in the Unites States is about 80 to 160 cases of GBS each week, **regardless of vaccination**" and that "data on the association between GBS and seasonal flu vaccination are variable and inconsistent across flu seasons.") (emphasis added).

According to the publicly available information from the CDC, not only is there no increased risk of GBS developing after receiving the Pfizer and Moderna vaccines, but the CDC actually recommends such vaccines for people who have previously experienced GBS as a result of vaccinations. *See* Center for Disease Control and Prevention, *Interim Clinical Considerations for Use of COVID-19 Vaccines Currently Approved or Authorized in the United States* https://www.cdc.gov/vaccines/covid-19/clinical-considerations/covid-19-vaccines-us.html (stating that "as with the general population, an mRNA COVID-19 vaccine is **preferred** over Janssen COVID-19" and that "history of GBS is a precaution for receipt of the Janssen COVID-19 vaccine" only) (emphasis added).

Based on the foregoing, the Court determines that Ms. Arthurs' stated concerns about the COVID-19 vaccine, unsupported by medical advice or research, are not the basis for this Court to disregard the reality that she has had the ability to receive the COVID-19 vaccine and has declined to do so.[2] The available evidence shows that there is no increased risk of contracting GBS from the Pfizer vaccine and in fact, there is more of a risk, though still a very low risk, that Ms. Arthurs could

---

[2] Ms. Arthurs' medical records indicate that she was offered and refused the Pfizer m-RNA vaccine on January 28, 2021. (See ECF No. 257, at 100.)

contract GBS after her receiving the vaccine for the seasonal flu than the vaccine for COVID-19. Thus, given the guidance from the CDC, the fact that she has received flu vaccinations twice since being incarcerated without any adverse reaction cuts against her argument that because she believes that she could have an enhanced risk of an adverse reaction to the COVID-19 vaccine, and the fact that she declined the vaccine is a permissible part of the Court's consideration of these matters.

During oral argument, Ms. Arthurs, through her counsel, also expressed concerns about receiving the COVID-19 vaccine because it was new and at the time that she was offered the vaccine in January of 2021, it was only available under an emergency use authorization ("EUA").[3] However, this argument no longer holds up because it has been over a year since Ms. Arthurs last considered receiving the Pfizer vaccine, it has now been fully approved and authorized for use, and according to the BOP, vaccine doses as well as boosters are currently "available at each [BOP] location for newly-admitted and **existing inmates**." *See* Federal Bureau of Prisons, *COVID-19 Coronavirus* https://www.bop.gov/coronavirus/ (emphasis added). Thus, in the Court's estimation, nothing medically nor logistically precludes Ms. Arthurs from receiving the Pfizer vaccine and protecting herself from COVID-19 within the BOP.

Other courts have addressed the circumstance of a defendant who refuses the COVID-19 vaccine, but nonetheless requests compassionate release based on serious medical conditions that make potential contraction of COVID-19 more likely severe. In *United States v. Rollness*, the defendant refused the COVID-19 vaccination, as well as all other vaccinations, because of "medical,

---

[3] At that time, the Pfizer vaccine was EUA, however, the Pfizer vaccine is now fully approved. *See* Centers for Disease Control and Prevention, *Pfizer-BioTech COVID-19 Vaccine (also known as COMIRNATY) Overview and Safety* https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines/Pfizer-BioNTech.html (stating that the Pfizer vaccine received approval on August 2, 2021).

11

allergy and religious concerns." *United States v. Rollness*, CR06-041RSL, 2021 WL 4476920, at *5 (W.D. Wash. Sept. 30, 2021). The defendant had refused all vaccines, and the Court concluded that the "medical records defendant cites regarding rejecting non-COVID-19 vaccines do not explain the reason for defendants' rejections, and defendant cites no medical records substantiating that he has allergic reactions to vaccines." *Id.* As a result the Court determined that the defendant's "argument regarding COVID-19 vulnerability does not establish an extraordinary and compelling basis for compassionate release." *Id.*

But courts have also "sometimes excused vaccine refusal where defendants have demonstrated a specific medical risk associated with taking the COVID-19 vaccine." *United States v. Salazar*, 118CR00180NONESKO, 2022 WL 138530, at *5 (E.D. Cal. Jan. 14, 2022). However, in *Salazar*, where the defendant provided no actual evidence of adverse reactions to vaccines, the defendant had received the flu vaccine in 2020 with no documented complications, and the defendant failed to offer any support for his "allegation that he was advised by a medical professional against taking the COVID-19 vaccine," the Court determined that there was insufficient evidence on the record to establish a specific medical risk associated with the vaccine for that particular defendant. *Id.* at *5-6.

Ms. Arthurs' choice to refuse the Pfizer vaccine is not based on a specific medical risk or specific medical advice or direction. Ms. Arthurs was unable to produce any record evidence of an adverse reaction to the swine flu vaccine in the late 1970s or any diagnosis of GBS apart from her own testimony and Sealed Affidavit, nor did she provide any evidence, records or medical testimony of an adverse reaction to or contraction of GBS from her recent seasonal flu vaccinations. As noted above, Ms. Arthurs has also failed to provide any evidence that a medical professional specifically

advised her against taking the COVID-19 vaccine. There is no evidence in the record to corroborate the general averments in her Sealed Affidavit, or that any physician, at a BOP facility or otherwise, has specifically advised Ms. Arthurs to refuse the COVID-19 vaccine or any other vaccine because of her prior contraction of GBS. In fact, Ms. Arthurs' own testimony was that a physician at FCI Dublin told her she should refuse the vaccine only after she expressed concerns and only if she felt strongly against taking it, although she actually received the seasonal flu vaccine in 2020 and 2021. This contradicts the averments made in her Sealed Affidavit that she was "told by doctors to decline further vaccination, including any vaccine for COVID-19." (ECF No. 79, at Dkt. 20-cr-73.) Accordingly, the Court concludes based on the record before it that there is no specific medical risk from the COVID-19 vaccine that justifies Ms. Arthurs' refusal to take it.

However, the Court still concludes that Ms. Arthurs has established extraordinary and compelling reasons that could warrant release. To be sure, while the Court does not take the position that Ms. Arthurs' failure to demonstrate that she has a specific medical risk that justifies her vaccination refusal automatically precludes her from establishing extraordinary and compelling reasons for release, the Court is persuaded that the availability of the Pfizer vaccine in this case as a tool to mitigate Ms. Arthurs' risk of contracting a severe case of COVID-19 given her COPD diagnosis makes her condition less significant and weighs against her arguments for release. *See United States v. Baeza-Vargas*, 532 F. Supp. 3d 840, 843–44 (D. Ariz. 2021) ("Judges of this Court, as well as others around the country, have ruled with consistency that an inmate's denial of a COVID-19 vaccination weighs against a finding of extraordinary and compelling circumstances.") Nevertheless, considering the potential severity of a chronic disease like COPD in the BOP context, the Court concludes that she has a serious medical condition that substantially diminishes her ability

to provide self-care and which rises to an extraordinary and compelling reason authorizing her release, albeit of far less heft due to her declination of the COVID-19 vaccine. *See* U.S.S.G. § 1B1.13.

However, the analysis does not end here. The Court must next consider the § 3553(a) factors.

### C. The § 3553(a) Factors

While the Court concludes that Ms. Arthurs has presented an extraordinary and compelling reason for release, namely her diagnosis of COPD in the context of the ongoing COVID-19 pandemic, upon consideration of the applicable sentencing factors, the Court determines that Ms. Arthurs' release is unwarranted at this time.

Specifically, "in considering the section 3553(a) factors, [the Court] should assess whether those factors outweigh the 'extraordinary and compelling reasons' warranting compassionate release, particularly whether compassionate release would undermine the goals of the original sentence." *United States v. Bess*, 455 F. Supp. 3d 53, 66 (W.D.N.Y. Apr. 22, 2020) (citation omitted). The determination of "whether to reduce an eligible defendant's term of incarceration for compassionate release after considering the § 3553(a) factors is committed to the discretion of the [district court]." *United States v. Jones*, No. 12-000038, 2020 WL 3871084, at *4 (W.D. Pa. July 8, 2020) (citing *United States v. Pawlowski*, 967 F.3d 327 (3d Cir. June 26, 2020)). That discretion includes the district court's authority to consider the length of the defendant's original custodial sentence, including the portions served and remaining, when weighing the § 3553(a) factors. *Pawlowski*, 967 F.3d at 330–31.

Here, the § 3553(a) factors, specifically the need for the sentence imposed to reflect the seriousness of the conduct offense and the need to avoid unwarranted sentence disparities among defendants with similar records of criminal conduct, strongly counsel against release. *See* 18 U.S.C. § 3553(a)(2); § 3553(a)(6).

Ms. Arthurs was charged with and pleaded guilty to serious and substantial crimes in which she was a major and central participant in what was in essence an opioid "pill mill" operation that endangered the lives of hundreds of people in the community and in a conspiracy to commit significant health care fraud and to launder money. The sentence imposed by this Court at the time of sentencing, which the Court notes occurred after the pandemic began, was serious, and was intended to be sufficient but not greater than necessary to serve the purposes of sentencing based on the serious nature of the offense and Ms. Arthurs' history and characteristics. It remains so today. While Ms. Arthurs has served significant time in BOP custody, releasing Ms. Arthurs now, more than thirty six (36) months earlier than the end of the Court's originally imposed sentence, would not be appropriate, nor would it properly serve the purposes of sentencing. It simply would be a sentence far less than sufficient to fulfill the purposes of sentencing in Ms. Arthurs' case.

Additionally, as detailed above, Ms. Arthurs' risk of contracting a severe case of COVID-19, *i.e.* her extraordinary and compelling reason for release, is made far less considerable by the availability of the Pfizer vaccine, and the fact that cases of COVID-19 at FCI Phoenix are low at the present time, and when weighed against the §3553(a) factors.[4] *See United States v. Brown*, No. 2:16-CR-00071, 2021 WL 3485895, at *6 n.4 (W.D. Pa. Aug. 9, 2021) ("[T]he fact that 80% of

---

[4] The Court notes that currently there are no COVID-19 cases among inmates or staff at FCI Phoenix. *See* Federal Bureau of Prisons, *COVID-19 Coronavirus* https://www.bop.gov/coronavirus/.

the inmates at [Defendant's] facility are vaccinated mitigates the risk of an outbreak and provides unvaccinated inmates like [Defendant's] with substantial protection from infection.").

Thus, the Court concludes that the extraordinary and compelling nature of Ms. Arthurs' medical condition in the context of the COVID-19 pandemic is significantly outweighed by the § 3553(a) factors based on the severity of her conduct as well as the relatively short period of time she has served in custody, such that release would not be appropriate at this time.

### IV. CONCLUSION

The Court has considered the relevant factors set forth in § 3582(c) including the factors set forth in § 3553(a). The Court finds and concludes that Ms. Arthurs' Motion is properly before it and that her medical condition rises to an "extraordinary and compelling" level in light of the COVID-19 pandemic. However, the Court ultimately concludes that to reduce Ms. Arthurs' sentence now would undermine the original goals of sentencing in this case such that a sentence modification at this time would be inappropriate.

Accordingly, Ms. Arthurs' Motion to Reduce Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) (ECF Nos. 234, 251) is hereby DENIED without prejudice to its reassertion should relevant circumstances change.

An appropriate Order will issue.

_____
Mark R. Hornak
Chief United States District Judge

Dated: March 16, 2021
cc: All counsel of record